RECEIVED

AUG - 8 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| HERMAN REED | CIVIL ACTION NO. 06-544 |
| VERSUS | JUDGE DOHERTY |
| BIOMET ORTHOPEDICS, INC. | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING

Currently pending before the Court is a Motion for Summary Judgment filed by defendant, Biomet Orthopedics Inc. ("Biomet"), wherein Biomet moves this Court to enter a judgment in its favor, dismissing all claims brought by plaintiff against Biomet. [Rec. Doc. 31] The motion is opposed by plaintiff. For the following reasons, the motion is GRANTED in its entirety.

## Background

In June of 2004, plaintiff Herman Reed was in an automobile accident, resulting in a fracture to his hip. Plaintiff received treatment at Louisiana State University Health Sciences Center at Shreveport ("LSUHSC") by Dr. Laura Gehrig, an orthopedic surgeon and assistant professor at LSUHSC. Dr. Gehrig surgically implanted a medical device, called the Vari-Angle Hip Screw ("VHS") System, to repair Mr. Reed's hip fracture.[1] Approximately eight months after plaintiff's implant surgery, an x-ray showed the VHS device had fractured, particularly the lag/hip screw, causing plaintiff to undergo a second operation to explant the VHS device.

---

[1]According to the product literature, submitted by both parties, "The Vari-Angle Hip Screw (VHS®) is a fracture fixation appliance to be used in treatment of fractures to the proximal femur. ... The components for the Vari-Angle Hip Screw (VHS®) include plate with adjustable barrel, lag screw with compression screw, cortical bone screw, and cancellous bone screws." [Product Literature, p.1]

On March 29, 2006 plaintiff filed suit against Biomet asserting two claims brought pursuant to the Louisiana Products Liability Act ("LPLA"). Plaintiff's first claim alleges the VHS device implanted in plaintiff's hip was "unreasonably dangerous in construction or composition because at the time the hip screw left the defendant's control, the product deviated in a material way from the defendant's specifications or performance standards for the hip screw or from otherwise identical hip screws made by the defendant."[2] Plaintiff's second claim alleges the VHS device was "unreasonably dangerous because the hip screw did not conform to an express warranty made by the defendant and this express warranty induced plaintiff's treating physicians to use the hip screw."[3] [4] [Rec. Doc. 1, ¶¶ 11 and12]

Thereafter, Biomet filed the pending motion for summary judgment. Biomet argues, "To date, Reed has failed to produce any evidence whatsoever that the VHS device was defective or that any express warranty was violated." [Rec. Doc. 31-3, p.6] In its memorandum, Biomet addresses both theories of liability asserted in plaintiff's Complaint (construction/composition and express

---

[2] For ease of reference, this first claim is sometimes referred to as "the construction/composition claim."

[3] For ease of reference, the second claim is sometimes referred to as "the express warranty claim."

[4] On August 28, 2006, Biomet filed a Third Party Complaint against Stuckenbrock Medizintechnik GMBH ("Stuckenbrock"), asserting that Stuckenbrock is the manufacturer of the product, and in the event Biomet is held liable to plaintiff for any loss arising out of the allegations contained in the complaint, Stuckenbrock owes Biomet indemnity and/or contribution. [Rec. Doc. 4; *see also* Rec. Doc. 32-2, pp.2-3] According to Biomet, "This VHS device was manufactured by Stuckenbrock in Germany and imported into the United States by Stuckenbrock's exclusive North American distributor, Implant Distribution Network, Ltd. ("IDN"). Biomet marketed the VHS device in the United States and sold the VHS to LSUHSC." [Rec. Doc. 31-3, p. 5] Stuckenbrock also has a Motion for Summary Judgment pending before the Court, wherein Stuckenbrock asserts the Third Party Complaint should be dismissed, arguing "the first-party plaintiff [Reed] has produced no evidence in support of his claims, mandating their dismissal, and accordingly, mandating the dismissal of the Third Party Complaint filed against Stuckenbrock." [Rec. Doc. 32-1] That motion will be the subject of a separate ruling.

warranty), as well as a third theory (inadequate warning) which was not explicitly asserted in the complaint.[5] In plaintiff's opposition memorandum, he begins the section of his brief entitled "Law and Argument" with the following statement: "In this case, the theory of liability against Biomet is that the VHS screw system was unreasonably dangerous in construction or composition because at the time that the product left Biomet's control, the VHS screw system deviated in a material way from Biomet's performance standards. LSA-R.S. 9:2800.55." Other than the construction/composition claim, no other theory of liability is addressed in plaintiff's opposition brief, either explicitly or implicitly.

## Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

---

[5] As to this third theory, Biomet states, "Although not expressly alleged in his Complaint, Reed may also attempt to assert that neither he nor his physician were adequately warned of the risks inherent in the VHS medical device."

As summarized by the Fifth Circuit in <u>Lindsey v. Sears Roebuck and Co.</u>, 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also*, <u>Moody v. Jefferson Parish School Board</u>, 2 F.3d 604, 606 (5th Cir.1993); <u>Duplantis v. Shell Offshore, Inc.</u>, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

<u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 884 (1990)(quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).

> . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

Id. at 888-89 (1990)(internal quotations and citations omitted).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

## Applicable Law

The Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51 *et seq.*, provides as follows:

> A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
>
> B. A product is unreasonably dangerous if and only if:

(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58

The jurisprudence has stated the prima facie elements for a claim brought pursuant to the above statute as follows:

> To maintain a successful products liability action under the LPLA, a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product;[6] (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous"; and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

Stahl v. Novartis Pharmaceuticals Corp., 283 F.3d 254, 260-61 (5th Cir. 2002); *see also* Butz v. Lynch, 762 So.2d 1214, 1217 (5th Cir. 2000)(citing Kennedy, John, A Primer on the Louisiana Products Liability Act, 49 La. Law Rev. 565, 583 (1989)). Additionally, pursuant to Louisiana law, "Defects are not presumed to be present by the mere happening of an accident." Spott v. Otis Elevator Co., 601 So.2d 1355, 1364 (La. 1992); *see also* Grenier v. Medical Engineering Corp., 243 F.3d 200, 205 (5th Cir. 2001)("Louisiana law does not allow a fact finder to presume an unreasonably dangerous design solely from the fact that injury occurred.")

## Analysis

1.    **Was the VHS Product Unreasonably Dangerous in Construction or Composition?**

---

[6] Although there is evidence in the record tending to show that third party defendant, Stuckenbrock, rather than Biomet, is the manufacturer of the product at issue in this case, that issue has not been put before the Court in *this* motion.

To maintain a claim that a product is "unreasonably dangerous in construction or composition," plaintiff must show:

> [A]t the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.

La. R.S. 9:2800.55. The Fifth Circuit has summarized, "The 'unreasonably dangerous in construction or composition' provision of the LPLA provides a remedy for damages caused by a product that is defective due to a mistake in the manufacturing process." Stahl at 262-63. Biomet contends there is no evidence, which would create a genuine issue of fact for trial, to support plaintiff's assertion that the VHS device implanted in his hip had a defect in construction or composition. In support, Biomet submitted the affidavit, expert report, and curriculum vitae of Dr. Charles R. Manning, Jr., Biomet's expert witness.[7] Dr. Manning conducted a visual examination of the VHS device, as well as an examination using a scanning electron microscope. Dr. Manning concluded the fracture of the hip screw occurred from overload failure (i.e., plaintiff applying "too much load on the fixation device"), and he additionally concluded "the device was not defective." [See Biomet Exhibit G.]

Biomet also submitted the affidavit and report of Dr. Ingo Haas, who is "Leader of the Quality Control and Laboratory Department at Gebrüder Martin GmbH & Co. KG," an independent laboratory in Mühlheim, Germany.[8] Dr. Haas conducted an investigation of the "components in this case that were sent to Stuckenbrock Medizintechnik GMBH by Louisiana State University in

---

[7] Dr. Manning has a Masters of Science in Metallurgical Engineering and a Doctorate in Materials Engineering. He serves as President of Accident Reconstruction Analysis, Inc.

[8] These documents have been submitted to the Court both in German and English; presumably, the English version is a translation.

America." [Biomet Exhibit F, ¶ 3]. Dr. Haas visually and stereomicroscopically examined the VHS device explanted from plaintiff and concluded, "The results of the investigation suggest that the break in the lag screw was caused by an 'overload fracture,' of excess or inappropriate biomechanical stress." [Biomet Exhibit F] He specifically states, "Referring to material defects or inclusions [composition defects], none could be determined on the two surfaces of fracture." [Biomet Exhibit F]

Additionally, Biomet has submitted portions of the deposition of plaintiff's treating physician, Dr. Laura Gehrig, who testified in pertinent part as follows:

Q. (BY MR. GOLD) Do you know - - I mean, you did the implant. I mean, why did the - - why did he fail to fuse as a - - matter of fact?

A. That - - you can't determine that.

Q. Okay. Okay.

A. As a matter of fact.

Q. Okay. Can you determine as a matter of fact why the hardware failed?

A. Based on objective criteria in the chart, you can follow his - - the healing process and there is a progression of increasing bone and still no healing, so based on the clinical notes regarding the patient, there are some things that may have contributed to his bone not healing, load being placed on the implant and the implant giving way.

Q. Okay. Can I ask you to explain what factors may have contributed to this - - to the lack of healing? I think that's what you said.

A. Smoking.

Q. Okay.

A. Motion of the fracture site; noncompliance; obesity.

Q. So, the likelihood is that he didn't follow doctors' orders to allow the healing process to take place correctly, and he overly stressed himself?

A. Based on the record, it's noted in there that he was noncompliant, and he would have trouble with meeting certain criteria that he was instructed to do.

. . .

Q. And, again, just to - - to be clear, the risk of hardware failure secondary to patient noncompliance or a patient's overstressing the device was a risk well know to you prior to implant?

A. Yes.

Q: Okay. And these risks would have been explained to Mr. Reed, as well?

A: Yes.

Q: Okay. Now, doctor, when the device was ex-planted - -

A: Yes.

Q: - - there's no mention of its condition in the ex-plant operative report. Do you recall what the device looked like on ex-plant, other than the fact that it did have a fracture?

A: No.

Q: Okay. If I told you that we've had it examined and it was shown to be significantly deformed at the fractured area, bent, in other words - -

A: Yes.

Q: - - would that, as a matter of fact, indicate to you that undue stress had been placed on the device?

A: Yes.

Q: Okay. And, again, the most likely sort of that undue stress was, in this instance, the patient?

A: Yes.

[Dr. Laura Gehrig depo., pp. 30 - 33]

Q: And I take it from your review of the clinical record before you came to the deposition today it is your opinion that Mr. Reed's smoking played some role in the nonunion of the fracture site?

A: Yes

Q: And it would be your opinion that motion at the fracture site suggesting nonunion or nonfusion played some role in the ultimate failure of the implant device?

A: Yes.

Q: And it is your opinion after reviewing the record that Mr. Reed's noncompliance with the precautionary instructions with regards to weight bearing and other things perhaps played a role in the failure of the implant device?

A: Yes.

Q: And also the fact that Mr. Reed was a large man who weighed approximately 300 or more pounds would have also played a role in the nonunion and the fracture of the implant device?

A: Based on the medical record, yes.

Q: And I believe you testified in response to Mr. Gold's questions that you recall the device was - - when it was taken out showed a - - a bend to the device itself. Do you have any active recollection of that?

A: Yes.

Q: And does that - - what typically - - let me just ask this way: Does - - the fact that there was a bend in the device, is that typical of a fatigue or overload failure?

A: Based on - - if you look at an x-ray and then you look at the device after you take it out of surgery, if it's been bent, the first thing that one would think of would be overload, too much weight on the device or too much cycling, multiple cycles of too - - of overload.

Q: And as I understand it, your opinion is that the heterotopic ossification, the bone growth in abnormal locations, the most likely cause of that was motion at the fracture site?

A:   Base on the medical record, if there's a nonunion at the fracture site, but heterotopic bone close to the fracture site, you can deduce that. There's no bone at the fracture site because there's motion there, but there's bone around the fracture site because of the way the bone is stimulated to grow. The ability to make bone is there, but its in an abnormal place because it's unable to make it where it's supposed to be making it due to a factor, such as motion.

Q:   And in your review of the records prior to the deposition, did you note several instances of noncompliance on Mr. Reed's part?

A:   Yes.

Q:   And the noncompliance would have been with regards to weight bearing and participation in physical therapy?

A:   Clinic follow-up.

Q:   And when you say - -

A:   Little effort into participating, admission that he was noncompliant in one way or another.

[Dr. Laura Gehrig depo., pp. 40 - 42]

In response, plaintiff argues:

[T]here is a disputed issue of fact about whether or not Herman Reed violated his doctor's instructions in regards to overuse of the VSH screw system. Therefore, there is a disputed issue of fact about whether or not the VHS screw system failed to meet the performance standards of Biomet.

...

Herman Reed will testify that he did not put his full weight on the implant and that he followed his doctor's instructions. . . . The attached medical records corroborate Herman Reed's testimony. *See Exhibit C of Herman Reed's Response to Motion for Summary Judgment.*[9]

[Rec. Doc. 42-1, p. 1, p. 3]  While perhaps plaintiff's medical records would indeed support

---

[9] Exhibit C consists of approximately fifty pages of medical records for Herman Reed, much of which consists of hand written notations. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." Forsyth v. Barr, 19 F. 3d, 1527, 1537 (5th Cir. 1994)(quoting Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 (5th Cir. 1992)).

-11-

plaintiff's testimony, whether or not plaintiff followed his doctor's instructions is not the pertinent inquiry. Rather, the pertinent inquiry is whether "the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. R.S. 9:2800.55; Stahl at 262-63. Thus, even if plaintiff is correct that there is a disputed issue of fact as to whether or not he followed his doctor's instructions, that disputed fact is not a *material fact* which would defeat defendant's motion for summary judgment, as it has no bearing on the absence of any evidence as to whether or not the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.

Plaintiff has failed to carry his burden of proof and provide evidence setting forth a genuine issue for trial. Lujan at 888-89. Specifically, plaintiff has failed to submit any evidence in support of his claim that the VHS implant implanted in his hip was defective in its composition.[10] In Stahl,

---

[10] In support of this claim, plaintiff has submitted only unsubstantiated argument, which is not relevant to the pertinent inquiry. Plaintiff's strongest argument is as follows:

> According to this [product] insert, this product is generally successful in aligning and stabilizing fractures. However if there is weight bearing or load bearing when there is delayed union or nonunion of bone, the implant will probably not be successful. Therefore according to this insert, this product should work and not fail as long as physicians properly instruct the patient in regards to not putting too much stress or load on the product and patients follow those instructions. Accordingly, if the VHS Screw System fails even though the physicians properly instructed the patient and the patient followed those instruction[sic], the VHS Screw System did not perform according to Biomet's standards.

[Rec. Doc. 42-1, p. 3] First, plaintiff admits in his argument that the product is "generally successful" and not *always* successful. Second, plaintiff makes a rather large leap in logic when he assumes that if a patient follows proper instructions provided by his physician, yet the implant nevertheless is unsuccessful, then the only conclusion is that the failure must have been caused by an "unreasonably dangerous ... product [which] deviated in a material way from the manufacturer's specifications or performance standards for the product of from otherwise identical products manufactured by the same

-12-

which also involved a construction and composition claim, the Fifth Circuit affirmed the district

court's summary judgment in favor of defendant, where plaintiff provided only conclusory and

unsubstantiated assertions that the drug Lamisil was unreasonably dangerous in composition. The

Court held:

> In the instant case, Novartis correctly argues that Stahl has provided no evidence
> raising a genuine issue of material fact as to whether Lamisil is unreasonably
> dangerous in construction or composition. While Stahl does provide some evidence
> that Lamisil's active ingredient can be dangerous to the liver, this evidence is not
> dispositive in a "construction or composition" claim under the LPLA. Therefore,
> summary judgment is appropriate because Stahl has not provided any evidence
> suggesting that the particular pills he received deviated in any way from the
> manufacturer's production standards or from the manufacturer's otherwise identical
> products.

Id. at 263.

As in Stahl, the same holds true in this matter. Plaintiff has provided no evidence raising

a genuine issue of material fact as to whether the VHS system implanted in his hip was

unreasonably dangerous in construction or composition. While plaintiff argues he followed his

physician's instructions, this argument is not dispositive in a construction or composition claim

under the LPLA, and is not pertinent to the inquiry at hand. Therefore, summary judgment is

appropriate because plaintiff has not provided any evidence suggesting the particular VHS implant

___

manufacturer." La. R.S. 9:2800.55. A review of the product insert clearly reveals multiple warnings
about how and why the product might fail, including obesity, insufficient quantity or quality of bone,
"increased blotting associated with non-union or delayed union," etc. (See Biomet Exhibit C.) Third, it
is not clear to this Court that plaintiff is competent to testify (or plaintiff's counsel is competent to argue)
that this product did not meet the manufacturer's performance standard, merely by providing their
interpretation of Biomet's product literature. *See e.g.*, Zachery v. Dow Corning Corp., 884 F.Supp.,
1061, 1065 (M.D. La. 1995)("Whether or not the implant was in fact fractured is not something that can
be determined without expert testimony."); Oiler v. Biomet Orthopedics, Inc., 2004 WL 325389, *8 (E.D.
La. 2004)("A determination of whether Oiler's post-operative complications could have been caused by a
contaminated prosthesis, in addition to whether the prosthesis was in fact contaminated, are issues that
require expert testimony; such a determination requires specialized medical knowledge not within the
average person's common understanding."); Zachery v. Dow Corning Corp., 884 F.Supp. 1061, 1065
(E.D. La. 1995)(holding whether prosthesis was cracked required expert testimony.)

he received deviated in any way from the manufacturer's production standards or from the manufacturer's otherwise identical products. Due to the foregoing, summary judgment is GRANTED in favor of defendant as to plaintiff's claim of defect in construction/composition.

**2. Was the VHS Product Unreasonably Dangerous Because of Nonconformity to an Express Warranty?**

As to plaintiff's second claim the product was unreasonably dangerous because it did not conform to an express warranty of the manufacturer, the claim is denied.[11] Louisiana R.S. 9:2800.58 states as follows:

> A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue.

The Louisiana Products Liability Act defines an "express warranty" as:

> A representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance. "Express warranty" does not mean a general opinion about or general praise of a product. A sample or model of a product is an express warranty.

Louisiana R.S. 9:2800.53.

As stated by the Fifth Circuit, to survive summary judgment on an express warranty claim:

> [A] plaintiff is required to demonstrate, or provide evidence to create a genuine issue of material fact regarding the following: (1) the manufacturer made an express warranty regarding the product, (2) the plaintiff was induced to use the product because of that warranty, (3) the product failed to conform to that express warranty, and (4) the plaintiff's damage was proximately caused because the express warranty was untrue.

---

[11]As previously noted, this claim was asserted in plaintiff's complaint, but was not addressed in his opposition to Biomet's motion for summary judgment.

Caboni v. General Motors Corp., 278 F.3d 448, 452 (5th Cir. 2002.)

Plaintiff has not offered, and this Court has not found, any evidence in the record which would demonstrate the manufacturer of the VHS system (or anyone else) made an "express warranty" regarding the product, as that term is defined in the LPLA. Furthermore, there is no evidence suggesting an express warranty (if one existed) induced plaintiff or another person (e.g. plaintiff's physician) to use the product. Finally, plaintiff has submitted no evidence suggesting the "untruthfulness" of any express warranty was the proximate cause of his damages. Due to the foregoing, summary judgment is GRANTED in favor of defendant as to plaintiff's claim the VHS device was unreasonably dangerous because it did not conform to an express warranty of the manufacturer about the product.

## 3. Was the VHS Product Unreasonably Dangerous Because an Adequate Warning About the Product Was Not Provided?

As previously noted, defendant argues, "Although not expressly alleged in his Complaint, Reed may also attempt to assert that neither he nor his physician were adequately warned of the risks inherent in the VHS medical device." La. R.S. 2800.57 provides in pertinent part:

> A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

As stated in Stahl:

> To successfully maintain a failure-to-warn claim under the LPLA, a plaintiff must demonstrate that the product in question has a potentially damage-causing characteristic and that the manufacturer failed to use reasonable care to provide an adequate warning about this characteristic. To meet the first prong of this test, we have indicated that a plaintiff must provide evidence about the "cause, frequency, severity, or consequences" of the dangerous characteristic in question.

Id. at 264(citations omitted).

As already noted, plaintiff has not addressed any such claim in his opposition memorandum, either expressly or impliedly, nor is there evidence in the record to support such a claim. Accordingly, defendant's motion for summary judgment as to any implied claim of inadequate warning is GRANTED.

## Conclusion

Due to the foregoing, the Court GRANTS the Motion for Summary Judgment [Rec. Doc. 31] filed by defendant, Biomet Orthopedics Inc., in its entirety.

THUS DONE AND SIGNED this _____ day of _____, 2008.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE